# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 7, 2011

## STATE OF TENNESSEE v. KENNETH SPENCER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-00769     Carolyn Wade Blackett, Judge**

**No. W2010-02455-CCA-R3-CD  - Filed December 8, 2011**

The defendant, Kenneth Spencer, was convicted by a Shelby County jury of first degree premeditated murder and was sentenced by the trial court to life imprisonment. He raises the following four issues on appeal: (1) whether the evidence was sufficient to sustain his conviction; (2) whether the trial court erred in denying his motion to suppress his statement to police; (3) whether the trial court erred in admitting evidence of his prior bad acts; and (4) whether the trial court impermissibly commented upon the evidence by issuing an incomplete statement to the jury on the element of premeditation. Based on our review, we conclude that the evidence was sufficient to sustain the conviction and that the trial court did not err in its evidentiary rulings. We further conclude, however, that the trial court committed reversible error by improperly commenting on the evidence and giving an incomplete statement of the law in its expanded premeditation instruction. Accordingly, we reverse the judgment of the trial court and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded for New Trial**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

Stephen C. Bush, District Public Defender; Tony N. Brayton (on appeal); Clifford T. Abeles, Jr. and Sanjeev Memula (at trial), Assistant Public Defenders, for the appellant, Kenneth Spencer.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; William L. Gibbons, District Attorney General; and Amy P. Weirich and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

At approximately 11:00 p.m. on November 7, 2008, fifty-five-year-old John Baker was sitting at the desk in the study of his Shelby County home, which was located on the corner of Foyle Way and Foyle Cove East, when he was killed by a bullet that pierced the window and struck him in the back of the head. The defendant, who had been involved in an earlier shooting altercation with the victim's young neighbor, Arsenio Delk, admitted in a statement to police that he had fired several gunshots that night at two cars parked near the victim's home because his friend, Kwane Morris, told him that Delk was inside one of them. The defendant and Morris were subsequently indicted together for the premeditated first degree murder of the victim. Their cases were later severed, and the defendant proceeded to trial before a Shelby County jury on October 4, 2010.

## Suppression Hearing

In a pretrial motion to suppress, the defendant alleged that his statement was involuntary because it resulted from trickery, deception, and promises of leniency made to him by his interviewing officers, which overbore his free will. At the April 22, 2010 suppression hearing, Detective Matthew Keaton of the Shelby County Sheriff's Department testified that the defendant and Kwane Morris were transported to the detective division for questioning at approximately 10:00 or 11:00 p.m. on November 8, 2008. Upon their arrival, the defendant was taken to a cubicle, where he was informed of his Miranda rights and signed a waiver of rights form before Detective Keaton began the interview. After the defendant and Morris had been questioned, both men were released from custody, as the detectives had nothing on which to hold them at that time. No written or video statement was taken on that date.

The defendant and Morris were again brought to the detective division and interviewed on November 13, 2008, after a search warrant had been executed at the defendant's home. Detective Keaton testified that the defendant was re-advised of his rights at that time and again signed a waiver of rights form before any questioning was begun. He identified the videotape of the interview, which was admitted as an exhibit and played before the court. The interview was conducted by Detective Keaton and his partner, Detective Terrell Robertson, of the Shelby County Sheriff's Department.

The defendant testified that he was eighteen years old and a high school graduate at the time the interview was conducted. He acknowledged that he could read and write and that he had signed the waiver of his rights prior to the interview, but he claimed that he did

not really have a full understanding of what his rights entailed. For instance, although he "kinda understood" that he did not have to talk to the officers, he was handcuffed to the chair during the interview, which made him feel that he was under arrest and had to give them a statement.

The defendant acknowledged that Detective Keaton, who at one point during the interview gave him his own jacket because he was cold, was kind to him during the entire interview process. Nonetheless, he indicated that he felt pressured into confessing due to the officers' statements to him that he would otherwise be painted as a "cold-blooded killer" and would have to tell his story to a judge and jury. In addition, his will was worn down by the officers' having led him in a prayer, with the exhortation to repent to God:

> I really felt like that how he was telling me that if I didn't say anything, then I have to say it in front of a jury or a judge. And he said, like, if I didn't say anything he'll paint me as a cold-blooded killer, but if I did say something then he can get on the stand and say I was just a 18 year old man -- 18 year old child that made a mistake and made a[n] accident. It was a[n] accident. And about the religion thing when he led me in prayer, that really broke me down or wore me down when he said about repenting to God and stuff like that.

The defendant said he thought, based on what the officers told him, that he would be charged with first degree murder if he did not give a statement but would receive a lesser charge, with the possibility of probation, if he confessed.

On May 21, 2010, the trial court entered an order denying the defendant's motion to suppress, finding that the defendant's waiver of his Miranda rights was knowing and intelligent and that his statement was voluntary.

## Trial

### State's Proof

Arsenio Delk, who lived on Foyle Cove East, testified that approximately one week before the victim's death, he and his friends were at a crowded Halloween party that was being held at a neighborhood home when he accidentally stepped on or jostled the defendant, who was attending the party with his friends, including Kwane Morris. He said that the defendant responded by pulling and cocking a .40 caliber gun at him, but he ducked back into the crowd and escaped. The defendant's response angered him, however, so when the defendant and his companions went outside, he followed and challenged the defendant to put down his gun and fight. The defendant refused to do so, and he and the defendant exchanged

-3-

angry words for five to seven minutes until the defendant and his companions walked across the street to a SUV. Next, someone in the defendant's group turned on the high beams of the vehicle, which shone directly in his face. A few seconds later, some shooting started and Delk was struck in the forearm by a bullet.

Delk testified that he was unable to see who shot him because of the headlights that were in his face but that the defendant was the only individual he saw with a gun that night. He stated that his friends drove him to the hospital after the shooting, where the only information he divulged, including to the police officer who came to question him, was that he had been shot at a party. Delk explained that he did not want the police to get involved but instead wanted to "keep a grudge" and handle the situation himself. He said he changed his mind the following week after learning that the victim had been shot. According to his testimony, that night he and his friends had attempted to enter another neighborhood house party but had been turned away by the home's owner, who did not want any trouble. They then spent the night driving around the neighborhood. Delk said that when he left his home for the party, several men from the neighborhood, including one known as "Big Josh," were hanging out in a car that was parked in his cove.

Delk acknowledged that he was on probation for possession of a weapon and aggravated burglary. On cross-examination, he denied that he was armed on the night the victim was shot or that he and his friends had been searching the neighborhood for the defendant and Morris.

Dedrick Nelson, aka "Dayday," a friend of Delk's, testified that he saw the defendant and Morris shooting at Delk on the night of the Halloween party. Nelson also described the encounter between Delk and the defendant that occurred inside the home that night, stating that after Delk stepped on the defendant's foot, the two men exchanged shoves before the defendant pulled a gun on Delk. He said that on November 7, he and Delk went to another neighborhood party after first chatting with "Big Josh" and some other men, who were hanging out in a vehicle in Delk's cove. He did not see the defendant at that second party but did see Morris attempt at one point to enter the home only to be turned away by the party's hosts. On cross-examination, he denied that he and Delk spent the evening of November 7 attempting to hunt down the defendant and Morris in order to retaliate for the Halloween night shooting.

Dorothy Bond, whose Foyle Cove East home was located beside Delk's, testified that she was awakened on the night of November 7, 2008, by three loud gunshots that sounded as if they had been fired right outside her bedroom window. She responded by rolling out of bed onto the floor and calling 9-1-1. A short while later, she saw a patrol car enter the cove and stop momentarily beside some cars parked beside the victim's home before

-4-

continuing around the cove and exiting.

Officer Charles Stevens of the Shelby County Sheriff's Department testified that he responded to the shots-fired call sometime between 11:20 and 11:30 p.m. on November 7, 2008, to find two men in two vehicles parked on the cove. The older man, who said he had just arrived to help the younger one jumpstart his car, had not heard any gunshots. The younger one, however, indicated that he had and pointed out the direction from which they had come. Officer Stevens patrolled through the area and the surrounding neighborhood, but he was unable to locate the source of the gunshots at that time.

The victim's widow, Evelyn Baker, testified that she was visiting her parents in Puerto Rico at the time the victim was killed.

The victim's son, twenty-five-year-old Terrance Baker, testified that he was living with his parents and working at a restaurant at the time of the victim's death. He said the victim called him at work at about 11:00 p.m. on November 7, 2008, to tell him that someone outside the home needed a boost and to ask where his jumper cables were, but the phone call cut off in mid-sentence. Baker testified that he attempted several times to call the victim back but eventually gave up under the assumption that the victim's phone had dropped the call and the victim was either too busy to answer his call back or unable to hear his phone over his music. He stated that when he arrived home at about 2:00 a.m., he heard music playing and walked to the victim's office, where he found the victim sitting in his chair in front of the computer. He said he initially thought the victim was asleep until he shook him and his head fell over.

Eighteen-year-old Patrick Jefferson testified that on the night of November 7, 2008, he picked up the defendant and Morris and drove to a neighborhood party. When they were turned away, Morris directed him to a neighborhood street, where the defendant got out of the vehicle and walked between some houses while Jefferson and Morris stayed behind in the vehicle. Jefferson acknowledged that he warned the defendant as he was getting out of the vehicle not to do anything "hot." He refused to explain, however, what it was he feared the defendant might do. He stated that after the defendant had been gone for a minute or two, he heard a couple of gunshots. The defendant then returned to the car, and Jefferson drove them to the defendant's home.

Upon further questioning, Jefferson acknowledged that he had provided more information in his statement to police, including that Morris had pointed out Delk's house to the defendant and that he had seen the defendant in the past with a .40 caliber black and gray gun. He further acknowledged that he had received phone calls from Morris in the weeks leading up to the defendant's trial. Jefferson identified a memorandum of

understanding regarding the State's use of his statement, which was signed by himself, his counsel, and the assistant district attorney. He also identified the audio recording of the statement itself. Both were then admitted as trial exhibits and published to the jury.

In the statement, Jefferson told investigators that when he and his friends reached the November 7 neighborhood party, Morris' sister told them that Delk had been there looking for them. Morris then directed Jefferson to drive them to Delk's cove, where he pointed to a car parked on the street and announced that he thought Delk was inside. According to Jefferson, Morris instructed him to turn the corner and pull over and then told the defendant that he had better get Delk before Delk got him or his family. At that point, the defendant got out of the car and began walking through a cut between the houses. Five minutes later, Jefferson heard three or four gunshots. Next, the defendant returned to the car and Jefferson drove them to the defendant's home.

Recarlous Brown testified that on the night of November 7, 2008, he, Josh Cole, and a third friend named Calvin stopped in Cole's car in the area of Foyle Way in southeast Shelby County to visit some of Cole's friends, including one whose first name was Arsenio. After Arsenio and his companions left, Cole discovered that his car battery was dead. At about that time, the victim came home and attempted to locate some booster cables in his vehicle and house to jumpstart Cole's vehicle. He was unable to find any, however, and returned to his home.

In the meantime, Cole had called another friend nicknamed "Big Robert," who arrived in his vehicle to attempt to help. Brown testified that "Big Robert" was about to drive him home so that he could retrieve some jumper cables when a car with lightly-tinted windows came down the street. He said the car attracted his attention because it appeared to have at least five individuals inside and was moving "too slow." The driver drove around the cove, pulled behind "Big Robert's" and Cole's vehicles, paused for a few seconds, drove back beside them, and then turned the corner. A couple of minutes later, Brown heard five gunshots, including one that ricocheted off Cole's rear windshield.

Brown testified that when the shooting stopped, "Big Robert" gave him and his companions a ride home in his vehicle. After he learned of the victim's death, Brown went downtown to the homicide office, where he gave a statement and identified the driver of the slow-moving vehicle from a photographic lineup.

Robert Adams, aka "Big Robert," testified that on the night of November 7, 2008, he and a friend stopped to visit another friend, Reggie, who lived on Foyle Cove East. When they arrived, they saw Josh Cole and two of Cole's friends, who were stopped in Cole's vehicle near the victim's home. Adams said that Reggie and the victim each searched their

respective homes for booster cables to help Cole start his car, but neither had any. He stated that he was still sitting in his vehicle talking to Cole when a car slowly pulled in the cove, paused briefly behind Cole's car, and then circled around the cove and left. A couple of minutes later, Adams heard three or four gunshots, including one that ricocheted off Cole's car. Afterwards, he drove everybody home.

Joshua Cole testified that on the night of November 7, 2008, he and three friends drove in his car to visit Terrance Baker at his home. While he was waiting in front of the Baker home for Terrance to come home from work, he saw and briefly chatted with his friend, Arsenio Delk. Delk left, and he then tried to start his own car only to find out that the battery was dead. His friend, Robert Adams, drove up, and Adams and the victim each searched unsuccessfully for some booster cables to jumpstart his car. As they did so, Cole heard four gunshots, one of which ricocheted off Cole's car. Afterwards, Adams drove Cole home, where Cole collected some jumper cables and then returned to the cove with his father to retrieve his car.

Officer Mark Thompson of the Shelby County Sheriff's Department, the first officer to respond to the victim's home, testified that by the time he arrived the medical personnel had determined that they could do nothing for the victim.

Dr. Marco Ross, a forensic pathologist and the deputy chief medical examiner for the Shelby County Medical Examiner's Office, testified that the victim was killed by a single gunshot wound to the back of head.

Detective Robert Butterick of the Shelby County Sheriff's Department testified that he found a bullet hole in the window of the victim's office with a corresponding hole in the curtain covering the window. After using a rod to establish the bullet's trajectory, he began searching the area between two neighboring houses at the end of the cove and discovered three fired shell casings at the base of the wall of one of the houses. He also found a bullet in a telephone junction box in front of the house.

Detective Butterick later executed search warrants at both the defendant's home and Morris' home. During the execution of the first search warrant, which occurred at the defendant's home on November 13, 2008, he found and seized a number of firearms and ammunition, including the following items: a pellet pistol, a .22 caliber pistol, and a .32 caliber semi-automatic pistol. The subsequent search of Morris' home resulted in the seizure of ammunition and two semi-automatic weapons – a black and silver/gray .40 caliber Smith and Wesson handgun and a black and silver/gray .380 Bryco handgun. Each weapon contained live rounds of ammunition in the magazine but none in the chamber. Detective Butterick testified that the ballistics evidence found at the crime scene, a bullet fragment

recovered from Arsenio Delk's arm, bullet fragments recovered from the victim's body, and a number of the items seized as a result of the search warrant were submitted to the Tennessee Bureau of Investigation ("TBI") laboratory for analysis.

TBI Special Agent Forensic Scientist Tommy Heflin, an expert in firearms examination, testified that the three cartridge cases recovered from East Foyle Way Cove were all fired from the Smith and Wesson .40 caliber pistol. He said that the fired bullets recovered from the victim's head, the cove, and Arsenio Delk's arm were all consistent in shape, type, and design with the live rounds that were loaded in the .40 caliber gun, but they were too damaged for him to conclusively determine that they had been fired from that gun.

Detective Matthew Keaton of the Shelby County Sheriff's Department testified that the defendant and Morris were developed as suspects based on information received from Arsenio Delk and other witnesses about the Halloween night shooting. He described his two interviews with the defendant and the techniques he and Detective Robertson employed in the second interview to get the defendant to reveal the truth about the November 7 shooting, testifying that when the defendant at some point made a religious reference, Detective Robertson realized that they could use the defendant's religious beliefs to help them "get to the truth." They, therefore, held hands and prayed with the defendant after first asking him if it would be all right for them to do so. Detective Keaton testified that it was neither the first time, nor the last, for the officers to employ such tactics.

In the statement, which was played for the jury, the defendant admitted that he had shot toward two cars near the victim's house under the belief that Arsenio Delk was inside one of them. He claimed, however, that he was just trying to scare Delk and the other occupants of the vehicles.

### Defendant's Proof

The defendant testified that he and Delk exchanged shoves at the Halloween party, were thrown out by the home's owner, and subsequently argued outside in the street. He denied, however, that he had a gun that night. Instead, he said that he began gathering his companions to leave after he saw Delk's friend, "Dayday," with a dark object by his side that appeared to be a handgun. According to the defendant, he had just opened the door to his friend's truck when gunshots erupted from different directions. He stated that, to his knowledge, none of the gunshots were fired by any of his companions. Later that night, however, he began receiving multiple threats regarding the shooting via his cell phone and his "MySpace" page.

-8-

The defendant further testified that on the night of November 7, 2008, he, Morris, and Jefferson attempted to enter the neighborhood house party but were turned away because it was too full. As they were leaving, they passed Delk's cove. Morris informed Jefferson that Delk lived there and Jefferson then drove them through the cove, in the process passing two cars that were stopped on the street. They then exited the cove, and Morris directed Jefferson to a cut or pathway between houses that led back to Delk's cove. The defendant said that he got out of the vehicle, ran through the cut to the cove, and started aimlessly shooting his gun with the intention of scaring the individuals in the vehicles. He described his actions:

> Well, we had got to the pathway, and when we got to the pathway, I had just jumped out the car, and I ran to the cove. When I got to the cove, I just drew my gun up and I just started shooting, carelessly. I wasn't aiming towards nothing. I [wasn't] aiming directly at nothing. I was just shooting carelessly. And I had r[u]n back to the car and jumped in the car. And we left.

The defendant insisted that he had no intention of shooting Delk or anyone else and expressed his remorse at the death of the victim. On cross-examination, he acknowledged that the gun he used in the shooting was his but denied that he retrieved it for the purpose of shooting Delk.

## **ANALYSIS**

### **I. Sufficiency of the Evidence**

As his first issue, the defendant challenges the sufficiency of the evidence in support of his first degree murder conviction. Specifically, he argues that there was insufficient proof in support of the element of premeditation and that his conviction should be reduced to either reckless homicide or second degree murder. In support, he asserts that there was no evidence that he made any declarations of an intent to kill anyone, took any steps beforehand to conceal the crime, or held any previously formed intent or design to kill. The State argues that there was sufficient proof from which a rational jury could reasonably find that the defendant fired at the vehicles in the cove with the intention of killing Arsenio Delk, shooting and killing the victim instead. We agree with the State.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt

beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" is defined in our criminal code as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation exists in any particular case is a question of fact for the jury

-10-

to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Our courts have come up with a non-exhaustive list of factors which, if present, may support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); Bland, 958 S.W.2d at 660.

To sustain a conviction for first degree premeditated murder, the State need not prove that the victim was the defendant's intended target. "Rather, the statute simply requires proof that the defendant's conscious objective was to kill a person, i.e., 'cause the result.'" Millen v. State, 988 S.W.2d 164, 168 (Tenn. 1999).

When viewed in the light most favorable to the State, the evidence established that the defendant, who believed that Delk carried a grudge against him for the previous week's shooting and was out to get him, drove with his friends to Delk's cove, and, after spotting someone he believed to be Delk inside a vehicle, pulled over on the next street, ran between some houses to the back of Delk's cove, and fired multiple gunshots at the vehicle in which he thought Delk was sitting. In the process, the victim was shot and killed. This evidence was sufficient to support the jury's finding that the victim's killing was the result of the defendant's premeditated act. We conclude, therefore, that the evidence was sufficient to sustain the defendant's conviction for first degree premeditated murder.

## II. Denial of Motion to Suppress Statement

The defendant contends that the trial court erred in denying his motion to suppress his statement to police, arguing that the statement resulted from "psychological coercion by law enforcement officers via the use of religious prayer, isolation, deception, promises of leniency and [his] lack of understanding" regarding his constitutional rights. The State responds by arguing that the trial court properly found that the statement was voluntary after considering the totality of the circumstances surrounding the interview. We, again, agree with the State.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and

resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused. . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S. 436, 444 (1966).

Under the Fifth Amendment, a confession is involuntary when it is the result of coercive action on the part of the State. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986). Our supreme court has concluded that "the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992). In order for a confession to be considered voluntary in Tennessee, it must not be the result of "'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). Courts look to the totality of the circumstances to determine whether a confession is voluntary. State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996).

The transcript and videotape of the second interview with the defendant reveals that the detectives, who were kind and cordial during the process, informed the defendant that they knew more about the situation than he was divulging and that they needed him to tell the whole story. At one point, Detective Keaton asked the defendant if he was a religious man. When the defendant replied yes and added that he went to church, Detective Keaton asked if he believed in repenting for his sins and that he would be forgiven "in the eyes of the Lord" if he did so. The defendant replied yes to both those questions and "[n]o sir," when asked whether he thought lying about what he had done was "Christian."

As the interview progressed, the detectives continued to urge the defendant to stop lying, telling him that it would be better for him, both emotionally and from a legal standpoint, to tell the whole story himself than to have people assume the worst. Along those lines, Detective Keaton told him that he could paint him as either a "cold-blooded killer" or as an "18 year old kid" who "was having a beef" with someone that "escalated out of hand" and led to "a mistake or an accident." At one point, Detective Robertson told the defendant that he if did not tell the story to the officers, "I can promise you this, you will tell it in front of a judge." He and Detective Keaton also asked the defendant if he knew the difference between first degree murder and lesser offenses and suggested that the defendant, by telling the true story of what had transpired, might be convicted of a lesser offense and possibly even receive probation.

The defendant, becoming emotional, finally admitted to the detectives that he and his friends had driven through Delk's cove and that he and another person had started shooting. At that point, Detective Keaton informed him that half-truths were going to "get [him] first degree . . . murder," that Morris had been sitting there crying with the detectives all morning because he had remorse for the victim, and that the defendant owed it to himself, the victim, and God to tell the truth and to ask for forgiveness. Detective Robertson then asked him if he wanted to pray. The victim twice indicated that he did, answering first that he did not "have a problem with it at all" and, when the question was repeated, nodding his head yes. Detective Robertson responded by holding the defendant's hand and praying to the "Heavenly Father" to forgive the defendant for his accidental killing of the victim and to strengthen his heart to tell the truth.[1]

In denying the motion to suppress, the trial court found that the detectives' discussions with the defendant about the possible charges and punishments he faced did not amount to promises of leniency that overbore his free will or rendered his statement involuntary. The court further found that the detectives' religious references and use of prayer, although "unnecessary," did not amount to coercion under the totality of the circumstances, which included the defendant's educational level, his waiver of rights, and the fact that he had

---

[1]The text of Detective Robertson's prayer, as transcribed, is as follows:

Oh Heavenly Father on this day we ask for forgiveness. We ask that you give this young man strength and realize what's right and wrong Lord. We ask that you strengthen his heart, that you put in his mind what truth is and Lord let the statements and words that come out of his mouth be the truth as he (inaudible) and repent for what he has done. He realizes that one of your commandments is thou shall not kill but yet though Lord it was an accident. Please find it Lord in your heart to forgive him so he can start (inaudible). This we all ask in the Lord Jesus name. Amen.

already begun to answer the detectives' questions prior to the initiation of the prayer.

The record supports the findings and conclusions of the trial court. In State v. Saint, 284 S.W.3d 340, 346 (Tenn. Crim. App. 2008), this court recognized that, although "questioning involving religious references has the potential to be coercive," there is no per se bar against it and that "the proper focus remains on the totality of the circumstances and whether the defendant's will was overborne by the police use of religious references." As the trial court noted, the defendant, a high school graduate who was fully advised of his rights and signed a waiver of rights form prior to questioning, had already begun to open up to the detectives before the prayer and references to repenting to God were made. Under the circumstances, we cannot find that the detectives' having appealed to the defendant's religious sensibilities and Christian teachings overbore his free will and caused him to make a statement that he otherwise would not have made. As such, we disagree with the defendant's assertion that "[p]rayer by its very nature is coercive."

We also cannot conclude that, under the totality of the circumstances, the detectives' statements that the defendant would have to tell his story to a judge, or their suggestion that he would receive a lesser charge if he confessed, rendered his statement involuntary. The defendant was fully informed of his rights before the interview began and thus knew that he could not be compelled to testify. And, although Detective Keaton informed the defendant that he would tell the district attorney that he had cooperated with the detectives and would talk to "the bosses" to see if he could get the charges reduced, he did not promise the defendant that he would succeed. Moreover, "[p]romises of leniency by state officers do not render subsequent confessions involuntary per se: The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are *compelled* by promises of leniency." Smith, 933 S.W.2d at 455 (internal quotations and citations omitted). We conclude, therefore, that the trial court properly denied the motion to suppress the defendant's statement.

### III. Prior Bad Act Evidence

The defendant contends that the trial court erred in admitting prior bad act evidence of his Halloween night altercation with Arsenio Delk, arguing that any probative value of the evidence was outweighed by the danger of unfair prejudice to his case. The State argues that the trial court properly admitted the evidence to show the defendant's motive and intent to kill Delk, which was highly relevant to the case.

Tennessee Rule of Evidence 404(b), provides as follows:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Exceptional cases in which evidence of an accused's prior bad acts will be admissible include those in which the evidence is introduced to prove identity, intent, motive, opportunity, or rebuttal of mistake or accident. State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995); see also Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[7][a] (5th ed. 2005). Where the trial judge has substantially complied with procedural requirements, the standard of review is abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

After holding a pretrial jury-out hearing at which the State presented the testimony of Arsenio Delk and Dedrick Nelson about the Halloween night altercation, the court ruled that the evidence was clear and convincing and that its probative value was not outweighed by the danger of unfair prejudice. Although the trial court did not specifically state on the record the material issue that justified its admission, it is clear from the context and the State's argument that the court found the evidence relevant to the State's attempt to establish premeditation. We agree that the evidence was relevant to show the defendant's intent and motive in committing the shooting and that the prejudicial impact of such evidence did not outweigh its probative value. We conclude, therefore, that the trial court did not err in admitting the evidence.

## IV. Special Jury Instruction on Premeditation

The final issue raised by the defendant is whether the trial court committed reversible error by granting the State's request for an expanded jury instruction on premeditation. The court gave this special instruction following its pattern jury instruction on premeditation:

> The Court further charges you that the element[] of premeditation may be inferred from the circumstances of the killing. The element of premeditation is a factual question to be determined by the jury from all the circumstances surrounding the killing. Several circumstances may be indicative of premeditation, including declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence and calmness immediately after the killing. A jury is not limited to any specific evidence in finding or inferring premeditation, but premeditation may be established by any evidence from which a rational jury may infer that the killing occurred after the exercise of reflection and judgment. In addition to these factors, the establishment of the motive for the killing is yet another factor from which the jury may infer premeditation.

In State v. Hollis, 342 S.W.3d 43 (Tenn. Crim. App. 2011), we reversed a defendant's first degree premeditated murder conviction and remanded for a new trial based on the trial court's use of a similar expanded jury instruction on the element of premeditation. Relying on our earlier analysis in State v. Brandon Compton, No. E2005-01419-CCA-R3-CD, 2006 WL 2924992 (Tenn. Crim. App. Oct. 13, 2006), perm. to appeal denied (Tenn. Feb. 26, 2007), in which we noted that the factors listed by a trial court as indicative of premeditation were incomplete statements of the law, we concluded that the expanded definition was not only misleading to the jury but also constituted an impermissible comment upon the evidence:

> In this case, we, likewise, conclude that the almost identically worded special instruction issued by the trial court contained an incomplete statement of the law and was therefore misleading to the jury. In addition, we agree with the defendant that it constituted an impermissible comment by the trial court upon the evidence. In its defense of the special instruction, the trial court stressed that the language came directly from the opinions of our supreme court. The court also expressed its concern that juries, without such a special instruction, have no "clue" as to which factors to consider in support of

-16-

premeditation. The quoted language, however, developed in the context of our supreme court's evaluation of the sufficiency of the evidence in first degree murder cases to determine whether there was sufficient proof, from all evidence presented, by which a rational jury could have reasonably inferred premeditation. The list of factors is "not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done 'after the exercise of reflection and judgment.'" State v. Rodney E. Howard, No. M2009-02081-CCA-R3-CD, 2010 WL 3774544, at *9 (Tenn. Crim. App. Sept. 29, 2010) (quoting Tenn. Code Ann. § 39-13-202(d)); see also State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004). In our view, by instructing the jury on specific factors, many of which were present in the case, that "might, if proven, tend to indicate the existence of premeditation," the trial court moved beyond providing a mere statement of the law and into the area of commenting on the evidence by directing the jury's attention to certain aspects of the proof presented in the case.

Hollis, 342 S.W.3d at 51.

We further concluded that because the instruction misstated the element of premeditation, it fell "within the category of a non-structural constitutional error that requires reversal of the conviction unless harmless beyond a reasonable doubt." Id. at 51-52 (citation omitted). In such a case, the proper inquiry is not whether a guilty verdict would surely have been rendered in a trial without the error, but instead whether the guilty verdict rendered in the trial "was surely unattributable to error." Id. at 52 (internal quotations and citations omitted).

In this case, although the proof of premeditation was stronger than it was in Hollis, it was not overwhelming, and we are unable to conclude the jury's guilty verdict was "surely unattributable" to the erroneous jury instruction. As such, we are constrained to reverse the defendant's conviction and remand for a new trial.

## CONCLUSION

Based on our review, we conclude that the evidence was sufficient to sustain the defendant's conviction and that the trial court did not err in admitting the defendant's statement and evidence of his alleged prior bad act. We further conclude that the trial court committed reversible error by granting the State's request for a special jury instruction on

premeditation.  Accordingly, we reverse the conviction and remand for a new trial.


_____
ALAN E. GLENN, JUDGE